**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| NIAGARA PRESERVATION, COALITION, INC. | ) ) ) ) |
| Plaintiff, | ) ) Civil Action No. 13-1015 (EGS) |
| v. | ) ) |
| FEDERAL ENERGY REGULATORY COMMISSION, et al. | ) ) ) |
| Defendants. | ) ) |

**MEMORANDUM OPINION**

Pending before the Court is defendants' motion to transfer venue to the United States District Court for the Western District of New York (the "Western District of New York"). Upon consideration of the motion, the response and replies thereto, the applicable law, and the entire record, the Court GRANTS defendants' motion to transfer venue.

**I.  Background**

Plaintiff is challenging the construction of a dry dock facility for the storage, maintenance, and refueling of tour boats by the Maid of the Mist Steamship Company ("Maid of the Mist" or "MOTM") on the Niagara River in New York. Def.'s Mot. at 1. The dock is being constructed on the site of the Schoellkopf Power Plant ("Power Plant Site"), which is listed on the National Register of Historic Places. Compl. ¶ 1. The

1

project is located on lands owned by the New York Power Authority ("NYPA"), which are managed by the New York State Office of Parks, Recreation and Historic Preservation ("OPRHP").  Defendant Federal Energy Regulatory Commission ("FERC") oversees the property pursuant to a license agreement with NYPA.[1]  Compl. ¶¶ 58-60.

MOTM currently stores its boats in Ontario, Canada; its lease for the Canadian storage facility is set to expire in 2014.  As a result of the expiration and MOTM's inability renew its Canadian lease, MOTM and the NYPA entered into a Memorandum of Understanding in 2012 for the construction of the dry dock facility at the Power Plant Site.  The facility is to become the property of the State of New York upon completion.  Def.'s Mot. at 2; Plaintiff's Opp'n at 4.  In December 2012, NYPA initiated a state environmental review process, which found in February 2013 that there would be no environmental impacts from the project that required the preparation of an Environmental Impact Statement ("EIS").  Def.'s Mot. at 2.  MOTM submitted a joint application to the Buffalo District of the United States Army Corps of Engineers ("USACE") in January 2013 for a Letter of

---

[1] In addition to FERC, plaintiff also brings this action against Jon Wellinghoff, in his official capacity as Chairman of FERC; the National Parks Service; Jon Jarvis, in his official capacity as Director of the National Parks Service; the United States Army Corps of Engineers; and Lieutenant General Thomas P. Bostick, in his official capacity as Commanding General and Chief of Engineers of USACE.  All defendants are located in the District of Columbia.  Compl. ¶¶ 6-11.

2

Permission pursuant to Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, for various permits relating to the project. Compl. ¶¶ 101-102. After consulting with New York state agencies, Native American Tribes, and other local entities, the Buffalo District of USACE issued a finding of "No Adverse Effect" regarding the project and a Letter of Permission in April 2013. Compl. ¶¶ 114-118.

NYPA filed a notice that it intended to approve the project with FERC on February 8, 2013, and asked that FERC authorize it to proceed by February 22, 2013. Compl. ¶¶ 63-64. Plaintiff filed a Motion to Intervene at the agency level on February 20, 2013. Id. ¶ 65. FERC authorized NYPA's notice request on March 8, 2013, and plaintiff filed a Request for Reconsideration on March 28, which is still pending. Id. ¶¶ 70, 80, 89-96. Plaintiff also filed a related Article 78/declaratory action proceeding in New York state court; its motion for a preliminary injunction was denied by the Appellate Division, Fourth Judicial Department in June 2013. Id. ¶¶ 121-126.

Plaintiff filed suit in this Court on July 3, 2013. Plaintiff seeks an order from the Court declaring that various approvals granted for the project were arbitrary and capricious and compelling defendants to conduct an analysis of the project as required by the National Environmental Policy Act ("NEPA"). On July 15, 2013, plaintiff filed a motion for a temporary

3

restraining order and preliminary injunction. Defendants then filed a motion to transfer this action to the Western District of New York on July 18, 2013, which plaintiff opposes. The motion to transfer is now ripe for determination.

**II. Standard of Review**

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought." In so doing, the district court has discretion to transfer a case based on an "'individualized case-by-case consideration of convenience and fairness.'" Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988) (quoting Van Dusen v. Barrack, 376 U.S. 612, 622 (1964)); see also Demery v. Montgomery County, 602 F. Supp. 2d 206, 210-211 (D.D.C. 2009) ("Because it is perhaps impossible to develop any fixed general rules on when cases should be transferred[,] . . . the proper technique to be employed is a factually analytical, case-by-case determination of convenience and fairness.") (internal quotation marks omitted)). The moving party bears the burden of establishing that transfer of the action is proper. Devaughn v. Inphonic, Inc., 403 F. Supp. 2d 68, 71 (D.D.C. 2005); see also SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1154 (D.C. Cir. 1978) (noting that the district court's denial of a motion to transfer "was effectively a ruling that [the appellant] had

failed to shoulder his burden").

In order to justify a transfer, defendants must make two showings. First, they must establish that plaintiff could have brought suit in the proposed transferee district. Devaughn, 403 F. Supp. 2d at 71-72; Trout Unlimited v. United States Dep't of Agric., 944 F. Supp. 13, 16 (D.D.C. 1996). Second, defendants must demonstrate that considerations of convenience and the interests of justice weigh in favor of a transfer. Devaughn, 403 F. Supp. 2d at 72; Trout Unlimited, 944 F. Supp. at 16.

**III. Discussion**

**A.   Where the Case Could have Been Brought**

The threshold question for the Court under § 1404(a) is whether plaintiff could have brought this action in the Western District of New York, the transferee court proposed by defendants. In an action brought against an officer or employee of the United States or its agencies, venue is proper is any district where (1) a defendant resides; (2) a substantial part of the events or omissions giving rise to the claim occurred; or (3) the plaintiff resides, if no real property is involved in the action. 28 U.S.C. § 1391.

Defendants argue that this case should be transferred to the Western District of New York because the District of Columbia has, at best, an attenuated connection to plaintiff's claims. Most of the operative events that give rise to plaintiff's claims

5

occurred in the Western District of New York, plaintiff and its members are based in New York, and the economic impacts of the project will be felt in New York. Def.'s Mot. at 1, 4-5. Significantly, plaintiff does not dispute that this action could have been brought there. In its opposition plaintiff argues only that transfer is inappropriate under § 1404(a), and has thus waived argument on whether this claim could have been brought in the transferee district. See CSX Transp. Inc. v. Commercial Union Ins., Co., 82 F.3d 478, 482-83 (D.C. Cir. 1996); see also Hopkins v. Women's Div., Bd. of Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion . . . addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

Because the instant action involves issues of federal law, all federal courts have subject matter jurisdiction over the claims. Compl. ¶¶ 127-213; see 28 U.S.C. § 1331. Accordingly, the Court concludes that this action could have been brought in the Western District of New York, and turns to the question of whether transfer is appropriate under § 1404(a).

**B. The Balance of Private and Public Interests**

In determining whether transfer is appropriate based on considerations of convenience and the interests of justice, the

6

Court weighs a number of private and public interest factors. See Devaughn, 403 F. Supp. 2d at 72. In this case, the Court concludes that, on balance, these factors weigh in favor of transfer. In particular, the traditional deference afforded to the plaintiff's choice of forum is diminished where, as here, the District of Columbia has no meaningful ties to the controversy, and what is "perhaps the most important factor - the interest in having local controversies decided at home," favors transfer. Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs, 893 F. Supp. 2d 49, 54 (D.D.C. 2012).

### 1. Private-Interest Factors

The private-interest considerations that the Court looks to in deciding whether to transfer a case include: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) where the claim arose; (4) the convenience of the parties; (5) the convenience of witnesses, particularly if important witnesses may actually be unavailable to give live trial testimony in one of the districts; and (6) the ease of access to sources of proof." Demery, 602 F. Supp. 2d at 210. As an initial matter, because this case is an action for review of an agency action where the case will be decided on the basis of the administrative record and live testimony is unlikely, see Def.'s Mot. at 11; Plaintiff's Opp'n at 8, the Court need not consider the fifth and sixth factors. See Greater Yellowstone Coalition

7

v. Kempthorne, No. 07-2111, 2008 U.S. Dist. LEXIS 33641, at *11-12 (D.D.C. Apr. 24, 2008) (explaining that in an APA action, these factors are not relevant to a court's venue analysis).

### a. Weighing the Plaintiff's Choice of Forum Against Defendants' Choice of Forum

The starting point of the Court's analysis of the private-interest inquiry pursuant to § 1404(a) is the parties' respective forum choices. The Court typically accords "substantial deference" to a plaintiff's choice of forum. Reiffin v. Microsoft Corp., 104 F. Supp. 2d 48, 52 (D.D.C. 2000); see also Pain v. United Techs. Corp., 637 F.2d 775, 783 (D.C. Cir. 1980) ("[A] trial judge must give considerable, but not conclusive, weight to the plaintiff's initial forum choice."). However, the Court will give a plaintiff's choice of forum substantially less deference when plaintiff chooses a forum that is not its home forum. See Reiffin, 104 F. Supp. 2d at 52 ("Deference to the plaintiff's choice of forum is particularly strong where the plaintiff has chosen his home forum. Conversely, substantially less deference is warranted when the forum preferred by the plaintiff is not his home forum."); Hawksbill Sea Turtle v. Fed. Emergency Mgmt. Agency, 939 F. Supp. 1, 3 (D.D.C. 1996) (noting that a plaintiff's choice of forum is entitled to less deference where there is "an insubstantial factual nexus with the plaintiff's choice") (internal quotation marks omitted). Transfer is thus proper when "the material

events that constitute the factual predicate for the plaintiffs claims occurred" in the transferee forum. Kafack v. Primerica Life Ins. Co., 934 F. Supp. 3, 6-7 (D.D.C. 1996).

It is undisputed that neither the Coalition nor any of its members is a resident of the District of Columbia. Plaintiff is a "not-for-profit corporation organized under New York Not-for-Profit Corporation Law with a mission to preserve and protect the environmental and historical character of the Niagara Falls National Heritage Area, Niagara Falls State Park, the Niagara River Gorge [], other waterfront properties in the 'high banks and other industrial area within Niagara County," all of which are in the state of New York. Compl. ¶ 5; see also Compl. ¶¶ 54-56 (describing some of the Coalition's members). As a result, plaintiff lacks significant ties to the District of Columbia, and need not be afforded the substantial deference given to litigants in choosing their home forum. See Reiffin, 104 F. Supp. 2d at 52; Shawnee Tribe v. United States, 298 F. Supp. 2d 21, 24 (D.D.C. 2002) (same) (collecting cases).

Plaintiff states that venue is proper in the District of Columbia because "[d]efendants all maintain principal offices within [this] geographic area," Compl. ¶ 20, and because the "federal claims have generally arisen from the decisions of federal agencies in the District of Columbia." Plaintiff's Opp'n at 7. However, according to defendants, the Court should not be

9

persuaded because "although some decision-makers reside in Washington, D.C., their decisions were based on facts and events arising in, and of concern primarily to, New York." Def.'s Mot. at 10. Defendants further argue that "while the Letter of Permission authorizing the construction project at issue was issued by the Army Corps, it was not issued by the Corps' Headquarters in Washington, D.C." but rather "by Corps officials in the Buffalo District from their offices in Buffalo, New York." Id. Plaintiff does not dispute this, and concedes that "the USACE General Permits were indeed administered and determined by the Buffalo District." Plaintiff's Opp'n at 8. Plaintiff attempts to distinguish this fact by claiming that the USACE permits have national implications in the application of nationwide permits and that "the impact of the decision making on issues relevant to plaintiff's claims will affect a site of nationwide significance." Plaintiff's Opp'n at 9.

While the Court acknowledges that some of the decisions regarding the MOTM project were made by federal decision-makers in the District of Columbia, the Court concludes that the majority of events and decisions relevant to the claims underlying plaintiff's lawsuit occurred in or around the Western District of New York. The Court also notes that the "mere involvement on the part of federal agencies, or some federal officials who are located in Washington D.C. is not

determinative" for the purposes of venue. Shawnee Tribe, 298 F. Supp. 2d at 25-26 (internal citations omitted); see also S. Utah Wilderness Alliance v. Lewis, 845 F. Supp. 2d 231, 235 (D.D.C. 2012). A plaintiff seeking to sue federal defendants in this District must instead demonstrate "substantial personalized involvement by a member of the Washington, D.C." agency in order for the Court to conclude that there exist meaningful ties to the District. S. Utah Wilderness Alliance v. Norton, No. 01-2518, 2002 U.S. Dist. LEXIS 27414, at *11 (D.D.C. June 28, 2002). Plaintiff has failed to make that showing here, arguing only that some decisions were made in Washington, D.C., but conceding that more decisions, as explained below, were made in New York.

Further, the Court agrees with defendants that while Niagara Falls has national importance, "the particular project and its impacts are local in nature." Def.'s Mot. at 10. In particular, apart from the FERC authorization made in the District of Columbia, see Compl. ¶¶ 58-96, the Court is persuaded by the fact that all of the other relevant decisions were made in New York, including: (1) decisions by the USACE Buffalo Division to grant various permits and issue a Letter of Permission to MOTM, see Compl. ¶¶ 97-120; Def.'s Mot., Ex. E; (2) the 2012 discussions between MOTM and NYPA regarding the construction of dry dock facilities at the Power Plant Site, Def.'s Mot., Ex. B at 4; (3) the New York State Environmental Quality Review, issued on

11

February 19, 2013, which concluded there would be no significant impact from the project, see Def.'s Mot., Ex. C; (4) the February 27, 2013 agreement between MOTM and NYPA requiring MOTM to build the dry dock facility at its own cost and cede legal title to the State of New York upon completion, see Def.'s Mot., Ex. B at 5; and (5) the unsuccessful New York State Article 78 Proceeding initiated by plaintiff to enjoin the project, see Compl. ¶¶ 121-126. Moreover, the project is located in New York and the economic impacts will be felt in the state.[2]

Therefore, because plaintiff has no connection to the District of Columbia, and because a majority of the operative events giving rise to plaintiff's claims occurred outside of the District of Columbia, the Court will afford less deference to plaintiff's choice of forum. The Court finds that defendants have legitimate reasons for preferring the Western District of New York, and that accordingly, this factor weighs in favor of transfer.

### b. Where the Claim Arose

It is clear that this claim arose in the Western District of New York, which is the judicial district in which Niagara Falls is located. All of the permits issued by USACE were issued out

---

[2] Defendants note that if MOTM does not have access to a dry dock, it will take several years for the State to find a new tour operator. This would cause NYPA to lose approximately $2.2 million in concession revenues each year, and would require cuts in the agency's budget to cover the shortfall. See Def.'s Mot. at 2.

of the Corps' Buffalo office, also located within that District. As described above, various state approvals and discussions occurred in New York. See Def.'s Mot. at 10; compare with Greater Yellowstone Coal., 2008 U.S. Dist. LEXIS 33641, at *14-15 ("[T]he Court also finds that the claim did not 'arise elsewhere,' but rather arose in this District, where the Rule was drafted and published . . . . The Final Rule was signed by the Assistant Secretary of the Interior for Fish and Wildlife and Parks, who is based in Washington, D.C."). Therefore, this factor generally weighs in favor of transfer.

c. The Convenience of the Parties

Finally, plaintiff in this action resides in New York, as do all of its members listed in the complaint. Though FERC is located in Washington, D.C., the various state agencies involved, MOTM, and the relevant USACE office are all located in New York. Therefore, this fact is neutral at best, but still weighs slightly in favor of defendants.

**2. Public-Interest Factors**

The Court has determined that the private-interest factors counsel in favor of granting defendant's motion to transfer. However, the Court must also analyze whether the public-interest factors also support granting defendant's motion. The Court concludes that they do.

The public interest considerations include: (1) the

13

transferee's familiarity with the governing laws and the pendency of related actions in the transferee forum; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. Devaugn, 403 F. Supp. 2d at 72.

        a.    The Western District of New York's Familiarity With the Governing Law and the Congestion of Both Courts

Plaintiff argues that while both courts are equally familiar with federal law, and neither have prior experience with this particular litigation involving the Power Plant Site, "the D.C. Circuit has had recent experience with adjudicating matters related to the FERC License, and its predecessors, that are at the heart of plaintiff's claims." Plaintiff's Opp'n at 12. In support of this argument, plaintiff cites to Eastern Niagara Public Power Alliance and Public Power Coalition v. F.E.R.C., an APA challenge in which the Circuit upheld an agency decision to grant a 50-year license for a hydroelectric project. 558 F.3d 564, 567-68 (D.C. Cir. 2009). However, plaintiff's reliance on Eastern Niagara is misplaced, as the Circuit, not the District Court, has jurisdiction to hear challenges to FERC's decision to grant licenses. See Plaintiff's Surreply at 1-2; 16 U.S.C. § 825l(b) ("Any party to a proceeding under [the Federal Power Act] aggrieved by an order issued by [FERC] in such proceeding may obtain a review of such order in Circuit Court of Appeals of the

14

United States [] for any circuit wherein the licensee or public utility to which the order relates is located or has its principle place of business, or in the United States Court of Appeals for the District of Columbia."). As plaintiff argues, Section 825p governs challenges to the enforcement of a FERC license, which is precisely what is at issue in the instant matter. Plaintiff's Surreply at 1-2; see 16 U.S.C. § 825p. The Western District of New York is certainly just as competent as this Court to hear a challenge to a federal law, especially where neither Court has entertained a similar challenge. See Def.'s Reply at 7; compare with Greater Yellowstone Coal., 2008 U.S. Dist. LEXIS 33641, at *16 (denying a motion to transfer where the court had "a long history with the facts and law" of the case and had "rejected previous attempts to transfer [the] litigation").

As to the congestion of the courts, both parties concede that this factor is neutral, as the time it would take to resolve the matter in both Districts is roughly the same. See Def.'s Mot. at 8 (noting that it takes approximately 9.4 months to resolve a case in the Western District of New York and 9.5 months in the District of Columbia); Plaintiff's Opp'n at 12.

        b.   <u>The Local Interest in Deciding Local Controversies at Home</u>

The final public-interest factor for the Court to consider is the local interest in deciding local controversies at home. While acknowledging that "the entities involved in the Project

15

may be local to the Niagara Falls region," plaintiff argues that "this matter is hardly a local controversy." Plaintiff's Opp'n at 12-13. Instead, plaintiff contends that the decisions at issue in this case involve an "area of international significance," and further that the "claims at issue arise substantially from determinations made in Washington, D.C. pursuant to federal law." Id. at 13. While it is undoubtedly true that the Niagara Falls area is one that is visited by tourists from around the country and world, it is equally true that most of the impacts of the project will be felt by residents of New York and the area surrounding the Project site. See Def.'s Reply at 7-8. Indeed, plaintiff notes in its complaint that many of its members enjoy recreational activities near the Project site and that their ability to do so will be or has already been foreclosed by the construction project. See Compl. ¶¶ 48-56. The environmental and historical impacts of the project, particularly as to the Smooth cliffbrake, a state-listed threatened plant species, will also largely affect the local area. Id. ¶¶ 35-47.

In cases where this court has denied transfer to a "local" venue, there was an overwhelming national interest in the case that is not present here. In Wilderness Society v. Babbitt, a motion to transfer an environmental action to the District of Alaska was denied because the court held that the decision under

16

review was one of "national significance." 104 F. Supp. 2d 10, 17 (D.D.C. 2000). However, the case involved a decision by the Department of the Interior to open the National Petroleum Reserve in Alaska, which the court explained had "consistently been treated as a national resource despite the special interest of the Alaskan people." Id. at 13. Indeed, Congress had directed the Department of the Interior to regulate the land "in a manner consistent with the total energy needs of the Nation." Id. (internal quotation marks omitted). Unlike the present case, six of the eight plaintiffs in Wilderness Society had offices in or were headquartered in the District of Columbia; a public hearing regarding the opening up of the land to oil and gas leasing was held in the District; and the Record of Decision was signed in the District. Id. at 15 (explaining that "the entire rulemaking process had a national dimension as comments were received from all 50 states and public meetings were held both inside and outside of Alaska").

Likewise, this Court's decision in Greater Yellowstone Coalition is instructive. There, the Court denied a motion to transfer despite defendants' arguments that the case involved a local issue. The Court noted that that the situation was like that in Wilderness Society because plaintiffs had ties to the District, there were multiple District based officials involved, and the issues were national. 2008 U.S. Dist. LEXIS 33641 at

17

*21.  The Court also concluded that the other two public interest factors favored plaintiffs' choice of forum because plaintiffs were the "first-to-file" and because the Court had a "long history with the facts and law surrounding [the] case and the prior litigation involving winter use at Yellowstone National Park."  Id. at *16-18.  All of this defeated defendants' "claim that the connection between Plaintiffs, the controversy and the forum is attenuated."  Id. at *21.  Plaintiff has failed to make a similar showing here.

The situations presented in Wilderness Society and in Greater Yellowstone Coalition are in stark contrast to the instant matter, where the only nexus to the District of Columbia is the fact that federal agencies involved in the decision-making are located here.  As explained more fully above, many of the decisions regarding the Project were made in New York by USACE and various state agencies.  Courts in this District have routinely transferred actions under circumstances that present similarly local issues.  For instance, in Shawnee Tribe, the court transferred a case to the District of Kansas upon a finding that the controversy was a local one, and that how the property at issue "is allocated directly impacts the counties and neighborhoods" near the property.  298 F. Supp. 2d at 26.  The court reached this conclusion despite facing a situation where, as here, some decisions had been made in the District of Columbia

18

and plaintiff had appealed the decision at the agency level. Id. at 26-27.[3] Defendants also cite to <u>Southern Utah Wilderness Alliance v. Norton</u>, where the court granted a motion to transfer over a dispute regarding oil and gas leases on 21 parcels of land in Utah. 315 F. Supp. 2d 82, 88-89 (D.D.C. 2002). The court found the case involved a local controversy notwithstanding the fact that the fate of those 21 parcels had been discussed in national publications, more than 160 members of Congress had proposed wilderness protection for the parcels to prevent oil exploration, and NRDC members had sent more than 90,000 electronic messages to Congressional members and the agency opposing the leases. 315 F. Supp. 2d at 85-86; <u>see also</u> <u>Pres. Soc'y of Charleston</u>, 893 F. Supp. 2d at 54-56 (granting a motion to transfer despite plaintiffs' arguments regarding "Charleston's national importance as a historic district" and explaining that "[i]n other cases where the land at issue was merely visited by or of interest to citizens from across the country, district courts in this district have not found a 'national interest' sufficient to render transfer appropriate"); <u>Sierra Club v. Flowers</u>, 276 F. Supp. 2d 62 (D.D.C. 2003) (granting defendant's

---

[3] The Court is not persuaded by plaintiff's attempts to distinguish <u>Shawnee Tribe</u>. <u>See</u> Plaintiff's Opp'n at 14. The fact that some "federal determinations were made by FERC in Washington, D.C.," <u>id.</u>, does not change the fact that the issue presented is a local one. Just like in <u>Shawnee Tribe</u> the only real connection to the District of Columbia in the instant matter is that FERC, NPS, and the USACE are headquartered here. <u>See</u> 289 F. Supp. 2d at 25.

19

motion to transfer because federal officials in the District of Columbia did not play an active role in decision making and the national significance of the Everglades alone was insufficient to warrant deference to plaintiff's choice of forum). Therefore, the Court finds that this factor as well favors transfer as well.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS defendants' motion to transfer venue. An appropriate order accompanies this Memorandum Opinion.

**SO ORDERED.**

**Signed:	EMMET G. SULLIVAN
UNITED STATES DISTRICT JUDGE
JULY 24, 2013**